**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| NSPIRE SPORTS LEAGUE, LLC, <br><br> *Plaintiff*, <br><br> v. <br><br> IFBB PROFESSIONAL LEAGUE, *et al*., <br><br> *Defendants*. | Case No. 1:16cv232 (CMH / TCB) |

**FIRST AMENDED COMPLAINT**

Nspire Sports League, LLC ("Nspire") files its First Amended Complaint against the IFBB Professional League ("IFBB Professional"), the International Federation of Bodybuilding and Fitness ("IFBB International"), and National Physique Committee of the USA, Inc. d/b/a NPC ("NPC") (collectively, the "IFBB Family"), and would show the Court as follows:

**NATURE OF ACTION**

1.     The "IFBB Family" – a term used by IFBB Professional on its website to describe the three defendants – has dominated amateur and professional bodybuilding for decades and uses its market position to exclude all significant would-be competitors.

2.     In violation of Section 1 of the Sherman Act, NPC, IFBB International, and IFBB Professional have entered into a series of anticompetitive agreements with each other wherein (i) IFBB Professional maintains a policy that requires U.S.-based amateurs to win or place highly at certain NPC-sponsored amateur competitions in order to join IFBB Professional; (ii) IFBB International has promulgated rules that automatically subject NPC's athletes without their knowledge to the loyalty rules contained in IFBB International's Constitution; (iii) NPC maintains a policy that excludes bodybuilders who compete for money in competitions held by

bodybuilding organizations outside the IFBB Family from competing in NPC-sanctioned events; and (iv) NPC maintains a practice where it will point out the loyalty rules in IFBB International's Constitution to prevent amateur athletes from participating in contests run by competing bodybuilding organizations.  The conspiracy among the three defendants results in a web of agreements between them that (i) forces all U.S.-based amateur bodybuilders who want to become an IFBB Professional athlete to compete exclusively at NPC-sanctioned events and to forego all potential income from bodybuilding contests until they are elevated to the ranks of professional bodybuilders within the IFBB Family; and (ii) prevents bodybuilding organizations outside the IFBB Family from competing for the services of elite amateur bodybuilders who could compete either in major amateur competitions or in professional competitions sanctioned, regulated, and/or promoted by that rival bodybuilding organization.

3. In violation of Section 2 of the Sherman Act, NPC has achieved, attempted to achieve, and/or conspired with IFBB International and IFBB Professional to obtain (i) monopoly power over the output market for the business of major amateur bodybuilding events in the United States; and (ii) monopsony power over the market for U.S.-based elite amateur athletes with a realistic chance of becoming a professional bodybuilder.  Specifically, NPC has combined with IFBB International, IFBB Professional, and/or other business run by the IFBB Family to establish a set of exclusive-dealing contracts and/or *de facto* exclusive-dealing contracts with promoters, vendors, sponsors, contest judges, and athletes to lock potential competitors, including Nspire, out of the most profitable segment of the United States bodybuilding market.

4. The IFBB Family has entered into several unlawful exclusive-dealing contracts and/or *de facto* exclusive-dealing contracts, including those that require IFBB International, IFBB Professional, NPC, and the media and marketing entities controlled by the IFBB Family's

leadership to blackball promoters, sponsors, venues, clothing or supplement manufactures, and others who do business with bodybuilding organizations outside the IFBB Family.  However, the most destructive of all these interlocking agreements are two provisions in IFBB International's written Constitution.  Article 19.4.7 of that document provides that "any athlete or official who participates in a competition or event not approved or sanctioned by the IFBB, may be fined, suspended or expelled" from the organization.  IFBB Int'l, Constit., art. 19.4.8 (updated March 2015).  Article 19.4.8 further states that no IFBB "athlete, judge, official, administrator or other Member shall hold membership in any other bodybuilding and/or fitness organization; nor shall that Member **_participate in or promote, in any way, shape or form_**, their activities, failing which the Member may be fined, suspended or expelled."  *Id*. at art. 19.4.8 (emphasis added).  The IFBB Family member in charge of amateur bodybuilding in the United States, NPC, enforces those provisions to prevent certain elite amateur athletes from associating themselves with contests or other events run by bodybuilding organizations, such as plaintiff Nspire, that pose a competitive threat to any member of the IFBB Family.

5.      The exclusive arrangements and conspiracy among IFBB International, NPC, and IFBB Professional, as alleged herein, has foreclosed competition and thereby enhanced and maintained (i) NPC's monopoly power in the output market for major amateur bodybuilding events in the United States; and (ii) NPC's monopsony power in the input market for elite amateur athletes, which in turn enhances and maintains IFBB Professional's monopoly power in the output market for professional bodybuilding events throughout the world.

6.      As a result of the IFBB Family's unlawful anticompetitive activities, competition has been stifled, and Nspire has been substantially injured in its business to the point where

Nspire likely will be forced out of the market altogether if the IFBB Family's anticompetitive conduct goes unchecked.

7.     The purpose of this action is to (i) clear the way for transparent and healthy competition in the bodybuilding community; and (ii) seek legal and equitable redress for the injuries Nspire has already sustained, or will suffer, as a result of the IFBB Family's ongoing violations of antitrust law.

## THE PARTIES

8.     Nspire is a Texas limited liability company with its principal place of business at 2430 Victory Park Lane, Dallas, Texas 75219.

9.     IFBB International purports to be a nonprofit legal entity registered under Spanish law and headquartered in Madrid, Spain.

10.     IFBB Professional is nonprofit corporation incorporated under the laws of Canada, which lists the following as its corporate address on the "Corporations Canada" website run by the Government of Canada:  2875 Bates Road, Montreal, Quebec QC H3S 1B7, Canada.

11.     NPC is a nonprofit Ohio corporation that is headquartered in Pittsburgh, Pennsylvania at 212 9th Street, Suite 500, Pittsburgh, Pennsylvania 15222.

## JURISDICTION AND VENUE

12.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because the action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

13.     This Court has jurisdiction over NPC because it is a corporation that transacts business in the district by, among other acts, holding amateur bodybuilding competitions in the Commonwealth of Virginia, such as:  (i) the Virginia Cup held on August 2, 2014 in Norfolk, Virginia; (ii) the Virginia Grand Prix held on June 13, 2015 in Norfolk, Virginia; (iii) the 2016 NPC MaxMuscle VA Classic Bodybuilding Show to be held on April 30, 2016 in Woodbridge,

4

Virginia; (iv) the 2016 NPC Virginia Battle Royale Championships to be held on August 20, 2016 in Virginia Beach, Virginia; and (v) the 2016 NPC Max Muscle Mid-Atlantic Open & Armed Forces Bodybuilding Show & the NPC VA/DC State Show to be held on November 12, 2016 in Woodbridge, Virginia.   Upon information and belief, NPC also appoints a District Chairperson for Virginia.

14.    This Court has jurisdiction over IFBB International because it is a foreign corporation that (i) transacts business in the district; (ii) has continuous and systematic ties with the Commonwealth of Virginia and the United States in general; and (iii) purposefully directs its anticompetitive activities into the Commonwealth of Virginia through, *inter alia*, binding hundreds or thousands of persons domiciled or doing business in the Commonwealth of Virginia to exclusive-dealing arrangements and/or *de facto* exclusive-dealing arrangements through Article 19.4.8 of its Constitution and/or other agreements or arrangements.   An example of IFBB International's continuous and systematic ties with the United States is the Arnold Classic Columbus, which is an amateur bodybuilding event sanctioned, organized, and promoted by IFBB International and held annually in Columbus, Ohio.   According to IFBB International's website, the Arnold Classic Columbus traditionally is the first IFBB International event of the competition season.   It is one of the very few amateur competitions in the United States at which international athletes compete, drawing over 700 competitors from 68 countries to the 2016 event.   The competition is heavily marketed and covered on IFBB International's website.

15.    This Court has jurisdiction over IFBB Professional because it is a foreign corporation that (i) transacts business in the district; (ii) has continuous and systematic ties with the Commonwealth of Virginia and the United States in general; and (iii) purposefully directs its anticompetitive activities into the Commonwealth of Virginia through, *inter alia*, binding

persons domiciled or doing business in the Commonwealth of Virginia to exclusive-dealing contracts and/or *de facto* exclusive-dealing contracts. An example of IFBB Professional's continuous and systematic ties with the Commonwealth of Virginia include the IFBB Lenda Murray Pro/Am Men's Physique, Women's Bodybuilding, and Figure contests, to be held on July 16, 2016 in Norfolk, Virginia.

16.     Venue is proper (i) under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) because the NPC, IFBB Professional, and IFBB International are each a corporation that transacts business in the district and/or because IFBB Professional and IFBB International are foreign corporations that transact business in the United States; and/or under (ii) under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## INTERSTATE TRADE AND COMMERCE

17.     The 1977 hit film *Pumping Iron* followed a young Arnold Schwarzenegger as he prepared to face Lou Ferrigno in an IFBB International-sanctioned bodybuilding contest, the 1975 Mr. Olympia. For many Americans, it was their first glimpse into the world of competitive bodybuilding. It would not, however, be their last. As Mr. Schwarzenegger's popularity grew, so did the public's interest in competitive bodybuilding, and this provided fertile grounds for the burgeoning of what became known as the fitness industry.

18.     Competitive bodybuilding (also referred to in the industry as "physique" and/or "fitness") competitions grew to be a prosperous niche sport that attracts tens of thousands of amateurs and professionals in the United States. Moreover, numerous health clubs and training facilities, supplement makers and distributors, workout gear manufacturers, magazine and website publishers, and other businesses sprang up to help people participate in the growth of bodybuilding. Altogether, the wider fitness industry is a multi-billion industry that focuses on attracting consumer-athletes and maintaining their loyalty.

19.     The IFBB Family has long maintained a dominant position within the bodybuilding segment of the fitness industry.

      a.      IFBB International is an organization that is to the sport of bodybuilding what the Swiss organization Fédération Internationale de Football Association ("FIFA") is to the sport of soccer – a lightly regulated entity that wields immense power over how and when official competitions are held, and how sponsorship money flows around the world.  According to its website, IFBB International "has 191 affiliated nations and is one of the largest and most active international sport federations in the world."  It also "[o]rganizes more than 2,000 local, national, regional, continental and world championships each year[,]" and "[s]upplies the video from its World and major Continental Championships to the major TV companies worldwide."  Moreover, Article 9.2 of the aforementioned Constitution provides:  "Although the IFBB shall not offer direct individual membership, members of National, Regional and Continental Federations, by virtue of their acceptance into the IFBB family, agree to be bound by the Constitution and Rules."  IFBB Int'l, Constit., art. 9.2.  Thus, the rules and regulations of IFBB International bind U.S.-based members of NPC.

      b.      NPC currently claims to have over 30,000 members across the United States who regularly compete in NPC sanctioned and

sponsored amateur bodybuilding, fitness, and physique competitions throughout the United States. NPC recently has represented to the U.S. District Court for the Western District of Pennsylvania that (i) "NPC has been the leading regulator, organizer, promoter and sanctioning body of amateur bodybuilding, fitness and physique competitions throughout the United States" for over three decades; and (ii) that "NPC regulates, organizes, promotes and sanctions approximately 300 bodybuilding, fitness and/or physique competitions throughout the United States" on an annual basis.

c.   Although professional bodybuilding had been controlled by an unincorporated committee within IFBB International since 1975, IFBB Professional was incorporated as a separate legal entity in 2005. The following chart, taken from IFBB Professional's website, illustrates its growth from 2005 to 2015:

| STATISTIC | 2005 | 2015 |
|---|---|---|
| Number of Divisions | 4 | 9 |
| Total Prize Money | $1,381,500 | $3,404,150[*] |
| Olympia Prize Money | $711,000 | $1,215,000[*] |
| Men's (Open) Bodybuilding Contests | 9 | 23[*] |
| Women's Bodybuilding Contests | 5 | 6 |
| Fitness Contests | 7 | 12[*] |
| Figure Contests | 12 | 24[*] |
| Bikini Contests | - | 38[*] |
| 212 Bodybuilding Contests | - | 17[*] |
| Men's Physique Contests | - | 37[*] |
| Women's Physique Contests | - | 24[*] |
| Wheelchair Contests | - | 3[*] |
| TOTAL ▶ | 33 | 184[*] |
| Number of Competitors | Over 200 | Over 1,200[*] |
| Number of Olympia Competitors | 65 | 182[*] |

[*]indicates new record set

IFBB Professional sanctions professional bodybuilding contests throughout America and around the world, including the IFBB Baltimore Grand Prix in Baltimore, Maryland; Joe Weider's Olympia Fitness & Performance Weekend in Las Vegas, Nevada; and the IFBB Lenda Murray Pro Am & NPC Virginia Classic in Norfolk, Virginia.

20.     Furthermore, the websites run by NPC and IFBB International offer the online purchase of merchandise, some of which is purchased by U.S. consumers.

21.     Consequently, the business activities of NPC, IFBB International, and IFBB Professional that are the subject of this action were within the flow of, and have substantially affected, interstate trade and commerce because they involve (i) the regulation and sanctioning of bodybuilding contests throughout the United States and the world; and (ii) commercial agreements with athletes, judges, sponsors, supplement makers, clothing manufacturers, and

other persons that reside throughout the United States and the world.  Furthermore, during the limitations period, each member of the IFBB Family transacted business in multiple states in a continuous and uninterrupted flow of interstate commerce throughout the United States.

## RELEVANT MARKETS

22.     There are three relevant markets for the purposes of this action.

### The Market for Professional Bodybuilding Contests

23.     The first relevant market is the market for the regulation, sanctioning, and promoting of professional bodybuilding contests.

a.     This is a worldwide market because many professional bodybuilding contests are open to athletes hailing from all corners of the earth, and professional bodybuilding athletes can, and regularly do, compete in contests held outside the nation in which they reside.  In addition, professional bodybuilding organizations are international in scope.

b.     The market for the regulation, sanctioning, and promoting of professional bodybuilding contests is distinct from the market for the regulation, sanctioning, and promoting of amateur bodybuilding contests for at least two reasons.  First, only professional contests offer prize money to athletes, and industry practice requires that event promoters provide only professional athletes with a *per diem* and reimbursement of travel costs.  Second, only those bodybuilding athletes who have been elevated to the rank of professional bodybuilder by a bodybuilding organization are eligible to participate in professional bodybuilding

contests.  Thus, to compete in professional bodybuilding contests, an athlete typically must have won or placed highly in certain select amateur competitions, been invited to join the professional ranks, and be a member in good standing of the bodybuilding organization by being up to date on his or her membership dues, following the bodybuilding organization's rules and regulation, and so on.

### The Market for Major Amateur Bodybuilding Contests

24.    The second relevant market is the market for the regulation, sanctioning, and promoting of major amateur bodybuilding contests, generally defined as bodybuilding contests involving 300 or more athletes and/or held in venues capable of accommodating 3,500 or more people.

a.    This is a national market because amateur bodybuilding organizations, such as IFBB International, are organized into national associations or entities that regulate, sanction, and promote competitions in their respective countries.  For example, only American athletes are allowed to compete in nearly every major amateur bodybuilding contest held by NPC.

b.    The market for the regulation, sanctioning, and promoting of major amateur bodybuilding contests is distinct from the market for the regulation, sanctioning, and promoting or professional bodybuilding contests for reasons explained above.  The market for the regulation, sanctioning, and promoting of *major* amateur bodybuilding contests is distinct from the market for the

regulation, sanctioning, and promoting of *non-major* amateur bodybuilding contests because, unlike a non-major amateur bodybuilding contest, a major amateur bodybuilding contest involves athletes coming from a much wider geographical area, participation by national and international sponsors (in addition to local sponsors), many more audience members, and the requirement of a larger venue.  Consequently, a major amateur bodybuilding contest involves much more marketing and financial risk than non-major amateur bodybuilding contests, and the promotion and staging of a major amateur bodybuilding contest requires extensive knowledge of multiple businesses, not to mention possession of useful connections in each business area. Promoters who operate at a lower stratum in the amateur bodybuilding industry simply cannot accomplish what a promoter of a major amateur bodybuilding contest can, so the output market for the regulation, sanctioning, and promoting of major amateur bodybuilding contests is defined by the distinct and inimitable nature of the services that more sophisticated promoters can provide.

### The Market for Elite Amateur Bodybuilders

25.     The third relevant market is the market for elite amateur athletes, *i.e.*, those athletes who are primed to be elevated to the ranks of professional bodybuilders.

a.      This is a national market because, as described above, most bodybuilding organizations are organized into national amateur

associations or entities and allow only American athletes to compete in nearly every major amateur bodybuilding contest held in the United States.  Furthermore, because amateur bodybuilders are ineligible for prize money and typically do not receive *per diem* payments or reimbursement of their travel costs, it is unlikely that foreign bodybuilders would incur the expense necessary to repeatedly travel to the United States to regularly participate in major amateur bodybuilding contests held here.

b.  The input market for elite amateur athletes is distinct from the input market for non-elite amateur athletes because the elite amateur athletes are – to borrow a phrase used by the Supreme Court in *International Boxing Club of New York, Inc. v. United States*, 358 U.S. 242, 252 (1959) – the "cream" of the crop in this field of athletic endeavor as is witnessed by objective factors, such as (i) receiving sponsorship deals; (ii) qualifying to compete at an NPC "national championship show" – *i.e.*, the USA Championships, the National Championships, the Junior USA Championships, the IFBB North American Championships, the Team Universe Championships, or an equivalent contest; and (iii) having physiques that would allow them to compete successfully in an NPC "national championship show" as determined by the objective criteria in the judging rules maintained by NPC, IFBB International, or another reputable bodybuilding

> organization, like Nspire.  Moreover, unlike the vast majority of the "gym rats" whose passion for bodybuilding outstrips their acumen for the sport, elite amateur athletes have a realistic chance of being elevated to the rank of professional bodybuilder.

26.   Bodybuilding is a unique industry.  Therefore, athletes that train for other sports are not a substitute for athletes that train for bodybuilding, and other sporting events are not a substitute for bodybuilding events for athletes that train for bodybuilding.

> a.   <u>Other Competitive Sports</u>:  Competitive sports (such as boxing and other combat sports, football, baseball, basketball, wrestling, and hockey) might feature heavily muscled athletes who untrained observers might think look like bodybuilders.  However, as was pointed out by Rick Wayne, a professional bodybuilder and journalist writing for magazines published by the IFBB Family, the exclusive focus of modern bodybuilding contests is the aesthetic quality of the athletes' physiques.  This, of course, distinguishes bodybuilding athletes from those athletes in other competitive sports where overall athletic prowess is prized, and from weightlifters whose muscles are useful only to the extent that they allow for greater feats of strength.  Thus, there are few, if any, professional or elite amateur bodybuilders who have crossed over to, and enjoyed success in, other sports.  Similarly, the weight training practiced by bodybuilders differs in meaningful ways from the weight training practiced by athletes competing in other sports,

and athletes who practice one form of training end up with physiques that differ markedly from those who practice the other. Therefore, few athletes who enjoyed top-level success in other sports have become a professional or elite amateur bodybuilder.

b.   <u>Professional Wrestling</u>:   Professional wrestlers also often have outsized physiques that are prized for their aesthetic appeal as much as for their strength.  However, agility is of great importance in professional wrestling, and professional wrestlers are often criticized by fans for losing their agility and becoming "muscle bound" when their physiques take on the proportions of bodybuilders.  Moreover, there have been few professional or elite amateur bodybuilders who have crossed over, and enjoyed success in, professional wrestling, and *vice versa*.

c.   <u>Beauty Pageants</u>:   Beauty pageants, like bodybuilding competitions, emphasize posing ability and stage presence. However, the aesthetics prized in beauty pageants are quite different from those prized in bodybuilding contests, so a successful bodybuilding athlete is unlikely to enjoy similar success in beauty pageants, and successful beauty pageant contestants are unlikely to enjoy similar success in bodybuilding competitions.  In addition, beauty pageants frequently require contestants to engage in activities other than posing – *e.g.*, providing an impromptu verbal response to a question about a current event – further

distancing beauty pageants from bodybuilding contests.  Thus,

there have been few, if any, cross-over successes in these areas.

27.    Similarly, for a consumer of bodybuilding events, there is little, if any, cross-elasticity of consumer demand between bodybuilding events and other sports events or other forms of entertainment because bodybuilding is a niche sport whose audience typically is comprised of family members and friends of the competing amateur bodybuilders.  Unlike most other competitive sports, the most profitable segment of the bodybuilding industry is contests involving amateurs, who compete at the same event and on the same stage as professionals, although in different "contests" within the same event.  This is because an amateur contestant typically draws an average of four or five paying spectators to a contest from his or her circle of family and friends, while professional contestants typically do not travel with friends and family and do not generally draw large numbers of ticket buyers themselves.  This is not to say that professional bodybuilders do not play an important role in the bodybuilding industry.  They do. Amateur bodybuilders look up to professional bodybuilders because of those athletes' record of success in the context of prize winnings and sponsorships, so a contest with professional bodybuilders will draw more elite amateur bodybuilders, which will draw more non-elite amateur bodybuilders, which will draw more paying spectators, which will draw more national and local sponsors, which will make the event more attractive to promoters and investors. However, because the audience of most bodybuilding contests is made up of the friends and family of amateur competitors in the contest, an increase in ticket prices to major amateur bodybuilding contests above the competitive level for a non-transitory period of time would not cause so many consumers to switch to other sporting events or entertainment options so as to make the price increase unprofitable.  Likewise, a lowering of ticket prices to other sporting

events or entertainment options for a non-transitory period of time would not cause consumers to stop attending major amateur bodybuilding contests to the degree necessary to effectuate a decrease in ticket prices for major amateur bodybuilding contests.

28. The barriers to entry in both the output markets and the input market are high.

    a. The barriers to entry in the output markets of regulating, sanctioning, and promoting professional and major amateur bodybuilding contests are high. For example, because of the exclusive-dealing arrangements and/or *de facto* exclusive-dealing arrangements that the IFBB Family maintains with promoters, a rival bodybuilding organization would have to promote its own events. Under normal circumstances, establishing and maintaining a bodybuilding promotion requires a substantial investment of capital, and a successful promotion requires the ability to secure appropriate athletes, venues, sponsorships, endorsements, and media distribution rights. The barriers to entry here are raised even further by the fact that the IFBB Family maintains exclusive-dealing contracts and/or *de facto* exclusive-dealing contracts that are designed to thwart a rival's ability to secure appropriate venues, sponsorships, endorsements, and media distribution rights.

    b. The barriers to entry in the input market of elite amateur bodybuilding athletes also are high. It can take years of extreme dedication to weight training before an athlete rises to the top of the amateur ranks, and IFBB International and NPC lock U.S.

competitors into the IFBB Family at the outset of their careers, typically at their first bodybuilding event (if it is an NPC-sanctioned event).  Furthermore, issues associated with language, travel, and other costs prevent a competitive bodybuilding league from recruiting potential amateur athletes from overseas.

c.  Finally, the very fact that the IFBB Family has maintained an unrivaled dominance over the relevant output and input markets since at least the early 1990s shows there are significant barriers to entry to the relevant market.

29.  If not for the conditions imposed by the IFBB Family that effectively prohibit athletes from associating with bodybuilding organizations outside NPC, IFBB International, and IFBB Professional, many U.S. athletes would choose to compete both in events associated with members of the IFBB Family and in events associated with other bodybuilding organizations, such as plaintiff Nspire.

## FACTUAL BACKGROUND

### The Rise of the IFBB

30.  As mentioned previously, bodybuilding's profile in the United States rose dramatically in 1977 with the debut of *Pumping Iron*.  Fortuitously, the movie appeared at an important time in the history of bodybuilding in America.  The long-running feud between IFBB International and the Amateur Athletic Union (the "AAU") over amateur bodybuilding in the United States was about to come to an end.  The IFBB International won that contest and eventually achieved unrivaled domination in the American bodybuilding industry.

31.  The war between the AAU and IFBB International did not start with IFBB International on top.  To the contrary, an unincorporated committee of the AAU – a sprawling

organization that represented the United States on international amateur competition matters and regulated amateur sports generally – had run amateur bodybuilding in the United States since the 1930s. The AAU committee – known as the "AAU National Weightlifting Committee" – was headed by Bob Hoffman, the founder of the York Barbell Corporation whose first love was weightlifting competitions. Thus, in the early days of U.S. bodybuilding, the physique contests run by Bob Hoffman always played second fiddle to the weightlifting contests held at the same venue, and even the bodybuilding contests put some emphasis on displays of athleticism. Bob Hoffman also believed in amateurism, so the centerpiece of the AAU's event schedule, the Mr. America competition, was open to amateur athletes only.

32.     IFBB International, on the other hand, was an upstart, founded in 1946 by two brothers, Ben and Joe Weider, in Montreal, Canada under the name "International Federation of Bodybuilders." Joe Weider took the lead role in the business, and his vision for bodybuilding differed greatly from that of the AAU. He thought that athletes should be judged purely on the basis of their physiques and, thus, created judging rules where athletes were awarded points strictly for their musculature and posing ability, as opposed to the rules for judging AAU contests, where points were awarded for athletic ability, often causing a perfectly developed man to lose on the basis of characteristics not associated with his physique. According to a journalist and bodybuilder long associated with the IFBB Family, Rick Wayne, Joe Weider also was worried about the premature retirement of many of the sport's greatest champions, so he and his brother set up IFBB International as an alternative to the AAU's National Physique Committee and, thus, created a bodybuilding industry with "an institutionalized opportunity for these men to make money with their muscles without sacrificing their dignity." To that end, he made a

professional contest, the Mr. Olympia, the centerpiece of the IFBB International's annual schedule.

33.    The promotional war between IFBB International and the AAU began in earnest around 1959, when IFBB International began organizing annual IFBB Mr. America contests in competition with the AAU's Mr. America competitions.  The IFBB experienced rapid growth from its founding through the 1960s.  According to IFBB Professional's website, "[b]y 1970, the IFBB would have Directors in over 50 countries throughout Australia, Asia, Europe, the Middle East, Africa, the Caribbean, and North, Central and South America."

34.    The 1970s also mark the era during which the IFBB family established hegemony over the international bodybuilding industry.  The Brothers Weider were advised in 1966 by Oscar State, Secretary General of the International Weightlifting Federation ("IWF") from 1960 to 1974, that IFBB International should set itself up as an official sports federation, like the IWF or FIFA.  Following the advice of their ally, the Weider brothers began taking the steps necessary to set IFBB International up as a sports federation, including drafting and adopting the aforementioned Constitution.  More importantly, two events happened in quick succession that enabled IFBB International to wrest power in the context of the international bodybuilding industry.

　　　　　　　a.    In 1967, an organization later known as the General Association of International Sports Federations ("GAISF") met for the first time. GAISF was formed to recognize and ensure autonomy for one international regulating federation per sport, and it provided an inclusive forum that gave voice to organizations regulating both Olympic and non-Olympic sports.

b.      In 1968, the IWF relinquished its authority of international bodybuilding, and IFBB International became the GAISF member charged with overseeing international bodybuilding in 1971. Because the GAISF rules forbade one member from interfering with another, IFBB International no longer had to fear renewed competition from the IWF in the context of the international bodybuilding industry.

35.     Despite IFBB International's success on the international level, Ben and Joe Weider's bodybuilding organization still was faced with a serious problem:   IFBB International did not have an amateurs-only affiliate in the United States.  IFBB International set up alliances with two existing amateurs-only bodybuilding organizations, but neither of these proved satisfactory.

36.     To establish an amateurs-only affiliate in the United States, Ben and Joe Weider decided to mount a hostile takeover of AAU National Weightlifting Committee.  According to the historian Randy Roach, IFBB International actually attempted to "infiltrate" the rival organization in October 1971.  However, even though IFBB International was able to place some allies on the AAU National Weightlifting Committee's board, Bob Hoffman retained power, and all attempts by the Weider brothers over the early 1970s to make the AAU National Weightlifting Committee the official U.S. affiliate of IFBB International came to naught.

37.     The fates once again intervened in the form of the efforts to pass the Olympic and Amateur Sports Act of 1978 ("Amateur Sports Act"), which eventually established the United States Olympic Committee and largely divested the AAU of its direct governance role over amateur athletics in the United States.   As early as 1976, the AAU realized that it would

eventually have to divest itself of its control over amateur sports, which would be delegated on a sport-by-sport basis to national governing bodies that, in turn, would operate under the guidance of the relevant international sports federation. Thus, according to the aforementioned Randy Roach, even before the passage of the Amateur Sports Act, "[w]eightlifting, power lifting and bodybuilding could begin operating as self-governing bodies, rendering the AAU to basically a liaison organization."

38.     By 1977, the AAU National Weightlifting Committee had formed separate committees for weightlifting, powerlifting, and bodybuilding (with the latter known as the "AAU National Physique Committee"). With the help of an ally named Ken Sprague, the Weider brothers were able to wrest control over the AAU National Physique Committee and seize Bob Hoffman's dominant position in U.S. amateur bodybuilding industry. Specifically, Ken Sprague got himself named Secretary of the AAU National Physique Committee, wrote the rulebook that would govern the committee's voting, secured for himself a number of powerful positions on its sub-committees, and took advantage of the fact that members whose chief interest lay in powerlifting were willing to barter their votes on the AAU National Physique Committee in exchange for Ken Sprague's sponsoring of the 1977 and 1978 Powerlifting Championships. The AAU National Physique Committee voted in 1977 to incorporate and elected as its Chairman the aforementioned Jim Manion.

39.     In 1977, Jim Manion was a recently retired bodybuilder (who competed in events from 1970 through 1975) and a loyal soldier within the Weider brothers' organization. According to the Randy Roach's *Muscle, Smoke & Mirrors*, Ken Sprague said: "We chose Jim Manion because Manion had attended all the early AAU/NPC organization meetings. Manion was inexperienced, but we felt we would be able to help him along. That sounds condescending,

but it's a fact of the rationale. The bottom line is that we saw Manion as a figurehead." Jim Manion dutifully incorporated an entity named "The National Physique Committee of the AAU, Inc." (the "AAU Corporation") under Ohio law in March 1978. Therefore, as is noted in *Muscle, Smoke & Mirrors*, the stage was set for the AAU National Physique Committee to officially affiliate with IFBB International during the AAU's National Convention in October of that year.

40.     However, Randy Roach also notes that the "old guard" under Bob Hoffman was not going to go down without a fight. The so-called "east coast York crowd" had rallied around Mike Katz in the hopes that electing him Chairman of the AAU National Physique Committee would prevent AAU bodybuilding from becoming a historical relic. The outcome of that election remained in doubt, despite Jim Manion's appointment of a large number of at-large and athlete delegates "under the fine-print of the rulebook" (to borrow a phrase from Ken Sprague). Thus, according to *Muscle, Smoke & Mirrors*, Ken Sprague took matters into his own hands, pulling 15 votes randomly from the ballot box and replacing them with 15 marked for Jim Manion; Jim Manion was elected by a total of three votes.

41.     In the end, Jim Manion was able to deliver the AAU Corporation to IFBB International as the American amateur bodybuilding affiliate of the AAU's hated rival. IFBB International rewarded Jim Manion by naming him IFBB International's Vice President for North America, and awarding him the IFBB International's Certificate of Merit. The AAU Corporation eventually was officially renamed, becoming "National Physique Committee of the U.S.A., Inc." – *i.e.*, one of the named defendants in this case.

42.     The AAU turned to the courts in an attempt to survive as a viable entity. On February 22, 1982, the AAU filed an antitrust suit against NPC in the U.S. District Court for the Eastern District of Tennessee, requesting an injunction forbidding NPC from punishing or

threatening to punish athletes participating in AAU-sanctioned contests with, among other things, "expulsion from [NPC] and exclusion from future competitions held at the regional, national and international levels[.]"

43.    The District Court Judge sided with the AAU on its claim against NPC, issuing on June 3, 1982 a preliminary injunction order that forbade NPC and certain individuals, including Jim Manion, from imposing or threatening to impose "any sanctions upon or otherwise penalizing or punishing or interfering in any way with any persons on account of that person's participation in any physique contest sanctioned by the [AAU], whether such person participates as an athlete, a promoter, a sponsor or otherwise."

44.    The Court eventually entered a stipulated judgment making the preliminary injunctive relief permanent:

> The defendants including [NPC and several affiliated entities], Mike Kizer and James Manion agree to continue their stated policy of not imposing any sanctions upon or otherwise penalizing or punishing or threatening to impose any sanctions upon or otherwise penalizing or interfering in any way with any persons on account of that persons' participation in any physique contest sanctioned by the [AAU] whether such person participates as an athlete, a promoter, a sponsor, or otherwise and will not condone, ratify, facilitate or permit such actions by any member or affiliate of the NPC for so long as the defendants (other than the NPC) remain as members or affiliates of the NPC.  The defendants will take all steps reasonably necessary to remedy any violation of their stated policy as set forth above, which violation comes to their attention.

Although the stipulated judgment refers only to the AAU, the IFBB International's Bob Cicherillo recently acknowledged in his official capacity as "IFBB athletes' rep[resentative]" during a February 16, 2016 podcast that IFBB International's understanding is that the injunction

forbids NPC from punishing any amateur for competing in a contest sanctioned by another bodybuilding organization.

45.     Although the AAU won that legal battle, it nevertheless still lost the war.  The AAU's membership among bodybuilders dwindled, and AAU-sanctioned bodybuilding contests became few and far between.  Even the Mr. America Contest, the AAU's flagship event, ended its run in 1999.  On the other hand, NPC and IFBB International flourished.  Complete victory in hand, the IFBB Family even renamed the "IFBB Mr. America Contest" the "NPC National Bodybuilding Championships" in 1978 to reflect the identity of its new United States affiliate.

### Defending the IFBB Family's Business

46.     IFBB International came to completely dominate professional bodybuilding during the 1970s, while NPC established a similar stranglehold over amateur bodybuilding contests in the United States in the mid-1980s.

47.     In the 1990s, however, a challenger to IFBB International's monopoly on the professional bodybuilding industry emerged in the form of Vincent Kennedy McMahon, the owner of the wrestling organization then known as the World Wrestling Federation.  Vince McMahon was, and is, a renowned promoter best known for taking a regional wrestling promotion and turning it into a nationwide powerhouse that eventually put all competing professional wrestling federations out of business.

48.     In the lead-up to the 1990 Mr. Olympia competition Vince McMahon was putting together what became known as the World Bodybuilding Federation ("WBF") in the hopes of knocking IFBB International off its top spot.  Vince McMahon's company, Titan Sports, began publishing a magazine called *Bodybuilding Lifestyles*, and it signed fifteen athletes to contracts that guaranteed each of them a salary far in excess of what he could legitimately expect to win through IFBB International's prize money, including thirteen who had been plying their trade

under the watchful eyes of the Weider brothers.  Vince McMahon also paid $5,000 to secure a sponsor's booth at the 1990 Mr. Olympia contest.

49.     On September 15, 1990, the WBF started off with a bang at the Arie Crown Theatre in Chicago, Illinois before 4,600 fans taking in the Mr. Olympia contest.  As was the custom then, sponsors were given the opportunity to give a live pitch to the audience.  Vince McMahon sent Tom Platz, a professional bodybuilder reported to be one of Joe Weider's favorite mentees, on stage to proclaim:  "I have a very important announcement to make.  We at Titan Sports are proud to announce the formation of the World Bodybuilding Federation.  And we are going to kick the IFBB's ass!"  The doors to the lobby opened, and alluring women wearing sashes embedded with the *Bodybuilding Lifestyles* logo filed into the theatre handing out advertising that announced the formation of the WBF, and claimed that the upstart would change the face of the bodybuilding world forever with "dramatic new events and the richest prize money in the history of the sport[.]"  Meanwhile, Vince McMahon's employees took advantage of the distraction to slip lucrative contracts under the hotel room doors where certain other Mr. Olympia hopefuls were staying.

50.     Joe Weider immediately took steps to drive the WBF out of business.  Because Vince McMahon was too powerful to be confronted directly, Joe Weider focused his efforts on controlling IFBB International's professional athletes, taking some actions that were nakedly anti-competitive in nature.  As IFBB International had done to amateur athletes who dared associate with the AAU in the 1970s and early 1980s, the Weider Brother's organization blackballed professionals who signed with the WBF from ever returning to compete for IFBB International.  Thus, if the WBF failed, those who accepted a contract from Vince McMahon

would never work in American bodybuilding again. Tom Platz, once Joe Weider's favorite, was banned from IFBB International for life.

51.     In the over-heated manner typical of IFBB International, Joe Weider made clear that the bodybuilders who dared try to maximize their earnings were "dead" to him and his bodybuilding organization.  At a May 18, 1991 contest run by IFBB International, the promoter set out on the stage thirteen tombstones, each inscribed with the name of one of the individuals who had defected to the WBF.  As dramatic music played, "loyal" bodybuilders destroyed the tombstones with sledgehammers.  Thus, the very man who took public credit for establishing professional bodybuilding as a way for the best athletes to earn a living at their sport of choice had turned on those athletes who decided to maximize their earning potentials outside the IFBB Family.

52.     But the WBF was not destined for a long run.  Vince McMahon's business plan was to incorporate some of the more theatrical elements of professional wrestling, then market bodybuilding competitions to a mass audience through pay per view television.  However, to borrow a phrase from "The Definitive History of the WBF" published in *The Pro-Wrestling Chronicle*, "[i]f professional wrestling is a niche sport, professional bodybuilding is a sport that appeals to so few that a word doesn't even exist to describe it.  In 1990, the only television coverage of bodybuilding to speak of was a show called American Muscle that ran roughly once a month on ESPN – at 3am."  There was no mass audience for professional bodybuilding contests, and the WBF's pay per view broadcasts failed to draw an audience, just like NBC's and CBS's doomed network broadcasts of bodybuilding contests did in the 1980s.  Thus, the WBF folded in July 1992 after a run that lasted less than two years.

53.     Of course, the thirteen "disloyal" athletes found themselves in a bit of a bind. Vince McMahon pled their case to Joe Weider, who "took mercy" on them.  He initially offered to reaccept the WBF bodybuilders into the IFBB Family for a "mere" $25,000 fine, but would later settle on a penalty of 10% of the bodybuilder's annual WBF earnings – an amount substantially higher than $25,000 for certain athletes.  According to the article "The Definitive History of the WBF," the IFBB Family "welcomed" the returning athletes back in a manner emphasizing the gravity of their betrayal and the benevolence of Joe Weider's dictatorship: "When the stage lights faded on at the Night of Champions XV at Manhattan's Beacon Theatre [on May 22, 1993], Dorian Yates stood in the center of the stage dressed as a preacher.  Caskets surrounded him bearing the names of the WBF athletes that had last appeared on tombstones at the same annual event two years prior.  As Yates elevated his arms to the heavens, the returning bodybuilders from the WBF raised from the dead and pulled themselves out from the coffins. On stage to greet them [were bodybuilders] who had remained loyal to the IFBB.  The two sides embraced in an emotional moment as the lyrics of the song 'Welcome Back' reverberated through the theatre."

**The Business of Bodybuilding**

54.     Although bodybuilding is a niche sport that does not appeal to a mass audience, that does not mean that there is no money to be made in the sport.  The *New York Times* published an article entitled "There's gold in pumping iron" on December 3, 1989, noting that the equipment manufacturer affiliated with the Weider brothers had $185 million dollars in U.S. sales for the fiscal year ending in May 1989.

55.     NPC, IFBB International, and IFBB Professional officially make money through the collection of membership fees from athletes and sanctioning fees from promoters.  NPC currently charges amateur athletes $120 to join, and IFBB Professional charges professional

athletes $300 (for athletes who pay their dues by January 15) or $500 (for athletes who pay after January 15) in annual membership fees.  The NPC and IFBB each charge promoters $3,000 for amateur events and from $3,500 to $20,000 per professional contest (with separate fees charged for each division in a contest, *i.e.*, bikini, physique, figure, or bodybuilding) in sanctioning fees, and the organizations also typically demand approximately 75% of any revenue derived from national sponsors.  However, that money is only the tip of the iceberg because the IFBB Family's empire has long extended far beyond the regulation and sanctioning of bodybuilding contests.

56.     Since the founding of IFBB International, businesses associated with the bodybuilding organization or its leaders also published various magazines where the Weider brothers would (i) market the various supplements, weight-training equipment, and other items that companies owned or controlled by them manufactured; and (ii) promote the fitness services provided by their operations.  Moreover, because the media controlled by the IFBB Family were the "journals of record" within the bodybuilding community, individuals and businesses who wanted to advertise in the Weider brothers' magazines often had to formally or informally agree to deal exclusively with the IFBB Family or its associated businesses.

57.     As time passed, the Weider brothers grew old and passed the torch of their empire to the aforementioned Jim Manion, who is President of both defendant IFBB Professional and defendant NPC as well as the Vice President for North America for defendant IFBB International.  His official biography on IFBB Professional's webpage describes his job duties as follows:  "Jim oversees the day-to-day management and operation of the IFBB Pro League and is therefore intimately involved in formulating the annual calendar of events; in negotiating contracts with event promoters; in keeping track of hundreds of professional athletes, judges and other officials; and in ensuring the IFBB Pro Rules are followed by all members.  In addition,

Jim regularly attends most professional competitions.  All of this is apart from his immense duties and responsibilities as President of the NPC."  Moreover, that biography emphasizes that Jim Manion has inherited Joe Weider's penchant for discipline, stating that the "The Chairman" (Jim Manion's preferred nickname) "does not suffer fools lightly."  He also retains Joe Weider's insistence on absolute loyalty, declaring during a November 12, 2007 interview on Pro Bodybuilding Radio that disloyalty to the IFBB Family is like marital infidelity, comparing an athlete seeking to return to the IFBB Family after competing for another bodybuilding organization to a husband who asks his wife to take him back after a year spent pursuing another woman.

58.     As was true under the Weider brothers' reign, the IFBB Family empire under Jim Manion extends far beyond the mere sanctioning of bodybuilding contests.  Businesses owned or controlled by Jim Manion – including NPC Active Wear, NPC News Online, and DSI – are involved in publishing, clothes manufacturing, and nutritional supplement distribution and marketing.  These companies are highly influential within the United States bodybuilding community because they serve as the main conduit between athletes (who are seeking sponsorship) and fitness industry businesses (who are seeking athlete endorsements or other publicity).

59.     The IFBB Family's empire has grown under Jim Manion's control.  According to the aforementioned "There's gold in pumping iron" article in the *New York Times*, the Weider brothers' empire was taking in over $300 million in annual U.S. revenue by the late 1980s. Upon information and belief, the revenue obtained by the IFBB Family and its related businesses has grown substantially to the present.

60.     Likewise, the IFBB Family's control of the bodybuilding industry has grown since Jim Manion became leader.

a.      IFBB Professional so dominates professional bodybuilding in America that people in the industry understand the term to "go pro" as a bodybuilder in the United States to mean to become an "IFBB Pro."   Moreover, upon information and belief, contests sanctioned by IFBB Professional bring in 95% of the revenue from professional bodybuilding events in the United States and 75% of the revenue from professional bodybuilding events across the globe.

b.      NPC and IFBB International dominate major amateur bodybuilding events in the United States.  At least eighty percent of all amateur bodybuilding athletes in the United States are associated with NPC, and the IFBB Family promotes over 50 percent (amounting to approximately 300 events annually) of all amateur bodybuilding events in the United States, including the vast majority of events held in larger venues where attendance and sponsorship revenues are highest.  There is no other bodybuilding organization that holds more than a few dozen competitions in the United States, and those are typically at smaller venues such as high schools and middle schools.

61.     Thus, the IFBB Family has achieved monopoly power in the output markets of regulating, sanctioning, and promoting worldwide professional bodybuilding contests (that it

confers on IFBB Professional) and regulating, sanctioning, and promoting major amateur bodybuilding contests in America (that it confers on NPC). It has not maintained those monopolies by putting on exceptional shows or taking good care of its athletes. Rather, the IFBB Family maintains dominance by "strong arming" athletes and businesses into accepting anti-competitive exclusive-dealing contracts and/or *de facto* exclusive-dealing contracts that destroy all other bodybuilding organizations' ability to compete.

62. The IFBB Professional Rules contain a provision forbidding athletes from competing in non-sanctioned events, which reads:

> Any Member, whether Athlete, Judge or Official, who participates in a competition not approved or sanctioned by the Pro League may be fined, suspended or expelled. Participation includes, but is not limited to, competing, guest posing, giving a seminar, judging, officiating, promoting, endorsing or otherwise taking part in any capacity whatsoever in a non-approved or nonsanctioned competition. An Athlete under a sponsorship contract may represent his or her sponsor at a display booth, regardless of whether or not the competition is sanctioned by the Pro League. However, the Athlete may not otherwise participate in the competition.

IFBB Prof'l, IFBB Professional League Rules § 1.5 (2009 ed.). Those official rules also contain a provision forbidding athletes from maintaining membership in any other bodybuilding organization:

> Once accepted as a Member of the Pro League, no Athlete, Judge or Official will hold membership in any other professional bodybuilding, fitness or figure organization; nor will that Member participate in, promote or endorse in any capacity whatsoever their activities, failing which the Member may be fined, suspended or expelled.

*Id.* at § 1.6. IFBB Professional also issues occasional public notices reminding its members of the required loyalty, such as the following:

JIM MANION, USA
PRESIDENT
TONY BLINN, CANADA
GENERAL SECRETARY



JOE & BEN WEIDER
CO-FOUNDERS
ERIC WEIDER, USA
PRESIDENT EMERITUS

From:        IFBB Professional League

To:          All IFBB Professional League Members

Date:        June 11, 2013

**SUBJECT:   NON-SANCTIONED EVENTS**

All members are reminded of Pro Rule 1.5, which states:

> Any Member, whether Athlete, Judge or Official, who participates in a competition not approved or sanctioned by the Pro League and the relevant IFBB National Affiliate (i.e. NPC in the United States) may be fined, suspended or expelled.  Participation includes, but is not limited to, competing, guest posing, giving a seminar, judging, officiating, promoting, endorsing or otherwise taking part in any capacity whatsoever in a non-approved or non-sanctioned competition.  An Athlete under a sponsorship contract may represent his or her sponsor at a display booth, regardless of whether or not the competition is sanctioned by the Pro League and the relevant IFBB National Affiliate. However, the Athlete may not otherwise participate in the competition.

Each member is solely responsible for ensuring that any event at which that member is guest posing or otherwise participating is in fact sanctioned by the Pro League and the relevant IFBB National Affiliate.

For events outside the continental USA, members are advised to contact the Pro League office to confirm whether or not the event is properly sanctioned. This will eliminate any possible future action that the Pro League would have to take against the member for guest posing or otherwise participating in a non-sanctioned event.


Jim Manion
President
IFBB Professional League

PO Box 3224, Pittsburgh, Pennsylvania, 15230 USA
Toll free: 866-304-4322 Direct: 412-276-5027 Fax: 412-281-0470
Email: ifbbproleague@aol.com  Web: www.ifbbpro.com

33

Thus, IFBB Professional requires bodybuilding events be certified both by it and entities like NPC that are the national amateur organizations affiliated with IFBB International, even though IFBB Professional and NPC are legally separate entities that purportedly act independently. Moreover, IFBB Professional's insistence on near-absolute loyalty from its athletes stands in stark contrast to Nspire's "contractless" vision for professional bodybuilding, which would allow athletes to compete anywhere, at any time, and for anyone.

63.     The IFBB International Constitution requires all members to take a similar oath of allegiance.  Article 19.4.7 of that document provides:

> Any athlete or official who participates in a competition or event not approved or sanctioned by the IFBB, may be fined, suspended or expelled.  The amount of the fine as well as the suspension period will be decided by the IFBB Disciplinary Commission, within the maximum limit as established by the Executive Council.  Once the suspension has been completed and before participating in an IFBB competition or event, the athlete must be drug tested at his or her own expenses.

> In special circumstances, the IFBB Disciplinary Commission may recommend to the Executive Council the expulsion of the athlete or the official.  Participation shall include, but shall not be limited to, competing, guest posing, giving a seminar, lecture or similar presentation, judging, officiating, allowing the use of one's name and/or likeness for promotional purposes, and/or taking part in a non-IFBB sanctioned competition or event in any other way, shape, or form.

IFBB Int'l, Constit., art. 19.4.8.  Article 19.4.8 further states:

> Once recognized by the IFBB pursuant to the terms and conditions of the Constitution and Rules, or pursuant to the terms and conditions of the Constitution and rules of a National, Regional or Continental affiliate, no athlete, judge, official, administrator or other Member shall hold membership in any other bodybuilding and/or fitness organization; ***nor shall that Member participate in***

> *or promote, in any way, shape or form, their activities, failing*
> *which the Member may be fined, suspended or expelled.*

*Id*. at art. 19.4.8 (emphasis added).  Thus, IFBB International imposes restraints on amateur athletes who are forbidden from accepting prize money for winning or placing highly at bodybuilding contests.

64.    Although careful not to promulgate a similar rule specific to its organization, bodybuilders who join NPC unknowingly bind themselves to IFBB International's loyalty rules. Under Article 9.2 of IFBB International's Constitution, "members of National, Regional and Continental Federations, *by virtue of their acceptance into the IFBB family*, agree to be bound by the Constitution and Rules."   IFBB Int'l, Constit., art. 9.2 (emphasis added).   Similarly, Article 9.3 provides:

> Athletes, judges, administrators, and other officials become
> Members of the IFBB *by virtue of their association* with their
> National, Regional or Continental Federation pursuant to the terms
> and conditions as set out in the constitution and rules of the
> respective National, Regional or Continental Federation.

*Id*. at art. 9.3 (emphasis added).  Thus, NPC is able to point to the loyalty provisions in IFBB International's Constitution when warning its athletes to avoid "unsanctioned" contests, accomplishing this through a "warning notice" posted on IFBB International's official website. For instance, on September 9, 2015, IFBB International issued the following warning on its website:

WARNING NOTICE

> "The IFBB Executive Council, in its 5th November 2015 meeting
> in Benidorm, Spain – on recommendation of the IFBB Disciplinary
> Commission, as per article 14.8.4 of the current IFBB Constitution
> – has deliberated the expulsion of Mr. Timothy Lee Thompson
> from the IFBB, due to his serious breach of provision 19.4.8 of the
> current IFBB Constitution.

> The IFBB specifies that athletes, judges and officials who will participate in Mr. Timothy Lee Thompson's organization competitions, will commit a violation of the current IFBB Constitution (article 19.4.7) and they will be liable to disciplinary measures."

> IFBB Legal Commission

Moreover, NPC also enforces its rules selectively.  For instance, during a recent podcast, David Baye, the online editor for the IFBB Family-affiliated magazine, *Muscular Development*, stated that the only NPC athlete who needs fear IFBB International's loyalty rules is "some famous person that a million people know[.]"  However, he also emphasized that competing in contests offering cash prizes held by another bodybuilding organization could become an issue if that amateur athlete wanted to compete in future NPC amateur competitions or "go pro" within the IFBB Family.  In fact, NPC automatically bans from its contests any athlete who has ever: "(i) Received any cash payment for competing in a physique contest; Or, (ii) Competed in a physique contest for prize money."  Accordingly, upon learning that an NPC-affiliated athlete has competed in another bodybuilding organization's professional contest, NPC regularly issues letters informing him or her that he or she is no longer eligible to compete at NPC-sanctioned events, but giving the athlete "the one time option" of returning to the NPC, while emphasizing: "Should you decide to again compete in a contest for cash or cash prizes after we accept this notification, you will lose your amateur eligibility permanently with NPC."

65.    The loyalty requirements in IFBB International's Constitution and the dominance of IFBB Professional in the worldwide professional bodybuilding market assists its IFBB Family member, NPC, to achieve monopoly power over major amateur bodybuilding competitions in the United States and monopsony power over American elite amateur bodybuilding athletes.  This is so because there is one and only one way to be invited from the NPC to join IFBB Professional:

An amateur athlete must win or place highly at a certain NPC-sanctioned amateur bodybuilding competition – *i.e.*, the USA Championships, the National Championships, the Junior USA Championships, the IFBB North American Championships, or the Team Universe Championships – then apply for a "pro card" and hope that Jim Manion will approve the request. As a result, amateurs with aspirations of turning pro must limit themselves to NPC-sanctioned events relatively early in their careers, or risk watching all their hard work come to naught because Jim Manion questions their loyalty.

66.    Furthermore, NPC's monopsony power over the input market for U.S.-based elite amateur bodybuilding athletes enables IFBB Professional to maintain its monopoly power over the output market for professional bodybuilding worldwide.   For instance, during the aforementioned November 12, 2007 Pro Bodybuilding Radio program, Jim Manion was asked why it is so difficult for Vince McMahon and other would-be competitors in the market for professional bodybuilding contests to compete against IFBB Professional.  He responded:  ". . . You need a feeder organization, and the NPC is a feeder organization to the IFBB.  I think I heard you say earlier that [the NPC is] responsible for 89% of the pros today.  I mean, [NPC is] the NCAA of bodybuilding.  Without the NCAA, there would be no pro football players, no pro basketball players.  So I kind of like to call the NPC the NCAA of bodybuilding."

**The IFBB Family's Loyalty Rules Are Unreasonable and Unnecessary**

67.    The IFBB Family's interlocking web of exclusivity arrangements is patently anticompetitive and unreasonable.  It prevents many bodybuilding athletes from earning a living at their sport of choice, or at very least delays their ascension into the ranks of professional bodybuilding.  The arrangements also stymy the ability of bodybuilding organizations outside the IFBB Family to compete effectively for the services of elite amateur bodybuilding athletes,

which of course only adds to the restraint on those athletes' ability to practice their trade and earn a living.

68.     The imposition of loyalty rules on amateur bodybuilders represents an unreasonable restraint of trade that is unnecessary for IFBB International, NPC, or IFBB Professional to thrive.  By their own accounts, each member of the IFBB Family has flourished over recent decades, despite the fact that NPC and/or other national affiliates of IFBB International have on at least three occasions retreated when faced with legal challenges to their ability to enforce such loyalty rules.

69.     One occasion was the preliminary injunction and stipulated order (making that provisional remedy permanent) entered by the Eastern District of Tennessee in 1982.

70.     A more recent instance stems from a complaint filed with the Swedish National Competition Authority against the Swedish Bodybuilding and Fitness Federation ("SKKF"), the only amateur bodybuilding organization recognized by IFBB International in that nation in October 2013.   In that matter, a nutritional supplement manufacturer, which occasionally sponsors its own bodybuilding contests, filed a complaint focusing, *inter alia*, on the SKKF rule permitting it to fine or suspend its members who compete or otherwise participate in contests that are not approved or authorized by SKKF or IFBB International.  Although SKKF initially argued that its loyalty rule was necessary to ensure that its members are free from doping, the investigation closed on May 28, 2014 after the SKKF formally agreed that athletes, coaches, officials and judges will no longer risk suspension or fines for participating in unsanctioned competitions.

71.     The most recent example involved NPC and the founder of Nspire, Timothy Lee Thompson.  As part of a settlement of a recent lawsuit, NPC and Jim Manion agreed that

amateur athletes affiliated with NPC could compete at Nspire-sanctioned events without fear of punishment, posting the following on NPC's official webpage: "Mr. Manion, NPC, Mr. Thompson and Nspire have also confirmed that all athletes, sponsors and promoters can compete and/or do business freely with NPC, Nspire, or any other amateur bodybuilding, fitness and physique organization without any negative repercussions or fear of retribution from Mr. Manion, NPC, Mr. Thompson and/or Nspire."

72.     NPC and other members of the IFBB Family ignore these commitments, however, as demonstrated in the continued presence of the loyalty provisions in IFBB International's Constitution and the enforcement of those loyalty rules by members of the IFBB Family, including as against Nspire.

### Injury to Competition

73.     IFBB Professional's monopoly over the output market for the regulation, sanctioning, and promoting of professional bodybuilding contests and NPC's monopoly over the output market for the regulation, sanctioning, and promoting of major amateur bodybuilding contests and monopsony over the input market for elite amateur athletes who are primed to be elevated to the ranks of professional bodybuilders injure competition in at least three ways.

74.     First, the combination of IFBB International's loyalty rules and NPC's refusal to allow athletes who earned money from or competed for cash prizes in contests sanctioned by a bodybuilding organization outside the IFBB Family improperly denies athletes an opportunity to earn a living at their sport of choice.  It also means that NPC-affiliated amateurs have to toil longer in the amateur ranks before making it to the professional level than they would if those rules did not exist.

75.     Second, professional bodybuilders earn less in prize money than they would if there was viable competition to IFBB Professional in the output market for the regulation,

sanctioning, and promoting of professional bodybuilding contests. Upon information and belief, the percentage of revenue going to professional bodybuilders from a bodybuilding contest is far less than the percentage that goes to athletes in the so-called "Big Four" professional sports leagues – *i.e.*, the National Football League, the National Basketball League, the National Hockey League, and Major League Baseball. Furthermore, the prize money awarded at IFBB International's professional competitions shot up when the WBF competed briefly.

76.    Third, NPC puts on lesser quality shows when not faced with viable competitors in the market for major amateur bodybuilding contests. Thus, NPC provides free entry and allows fans "meet and greet" access to large groups of professional bodybuilders when "counterprograming" against Nspire shows, but does not do so under other circumstances. Thus, bodybuilding enthusiasts are deprived of top-quality shows due to NPC's monopoly and monopsony powers.

### Nspire's Injury

77.    After becoming disillusioned with Jim Manion's leadership, Timothy Lee Thompson left his position as NPC's chairman in Texas and formed Plaintiff Nspire in 2015. In response, NPC, IFBB International, and IFBB Professional have done everything in the IFBB Family's power to interfere with Nspire's attempt to create a new bodybuilding league.

78.    One example of the IFBB Family's willful attempts to maintain their monopolies over the output markets for the regulation, sanctioning, and promoting of professional contests across the globe and major amateur bodybuilding contests in the United States as well as their monopsony over the input market for elite amateur bodybuilders in the United States is their interference with the 2015 Fitness Space City Championship (the "Space City Event") in Houston, Texas. Specifically, the IFBB Family attempted to destroy Nspire as a competitor by:

a.   Announcing in late-October 2015 that NPC also would be hosting an event – marketed as the "Texas Cup" – on the same day and in the same city in which the Space City Event was scheduled to take place.   The IFBB Family (i) stressed that Nspire's Space City Event was not an NPC-sanctioned event; and (ii) published the following statement on its website in early November 2015 under the heading "WARNING NOTICE":

> The IFBB Executive Council, in its 5th November 2015 meeting in Benidorm, Spain – on recommendation of the IFBB Disciplinary Commission . . . has deliberated the expulsion of Mr. Timothy Lee Thompson from the IFBB, due to his serious breach of provision 19.4.8 of the current IFBB Constitution.
>
> The IFBB specifies that athletes, judges and officials who will participate in Mr. Timothy Lee Thompson's organization competitions, will commit a violation of the current IFBB Constitution (article 19.4.7) and they will be liable to disciplinary measures.
>
> - IFBB Legal Commission

b.   The prominent warning to NPC athletes, judges, and officials that they would be subject to fines, suspension, or expulsion if they participated in an Nspire-organized competition had the effect of limiting and reducing the number and quality of athletes participating in Nspire's Space City Event.

c.   Upon information and belief, the IFBB Family also caused one of the sponsors of the Space City Event to pull out of it.   Specifically, Nspire had arranged with Pro Tan, a division of Performance Brands, Inc. to provide tanning services for competitors at the

Space City Event.  Pro Tan subsequently requested that Nspire not use the Pro Tan Logo in conjunction with the Space City Event, then went on to inform Nspire that Pro Tan was "unable to spray" competitors at the Space City event.  Pro Tan instead provided spray tan services at the NPC-sponsored Texas Cup.

d.     NPC's anticompetitive activities dramatically reduced attendance at the Space City Event, and Nspire consequently suffered a net loss of approximately $70,000 on the event.

e.     Furthermore, the IFBB Family through their agents, employees, or allies, including the aforementioned Bob Cicherillo on a podcast, trumpeted the alleged failure of Nspire's Space City Event, insinuated that Nspire is mismanaged, and bragged that Nspire would soon be out of business.

79.     There also have been other examples of businesses associated with IFBB and NPC refusing to associate with Nspire, such as:

a.     Keith Thomas, the founder and/or chief executive officer of a nutritional supplement business, informing his employees to avoid associating his company's brands with Nspire on social media because Mr. Thomas's business is "a IFBB / Loyal organization."

b.     A leading bodybuilding magazine, *Muscle & Fitness*, announcing that it could no longer work with an athlete who signed with Nspire "since we are with the NPC."

     c.     A venue in Kawai, Hawaii that agreed to rent its facility to Nspire

later recanted upon information and belief at the request of NPC,

IFBB International, IFBB Professional, or an agent or

spokesperson of one of these entities.

80.     Upon information and belief, members of the IFBB Family have used intimidation, threats, punishment, harassment, and/or coercion to (i) prevent vendors and sponsors from associating with Nspire; and (ii) cause certain physique athletes who left NPC and/or IFBB Professional to join Nspire, including Andreanna Calhoun and Logan Franklin, to return to NPC and/or IFBB Professional.

81.     The loss of talented, up-and-coming athletes, important sponsors, and access to proper venues and well-regarded media outlets will have a significant long-term negative financial impact on Nspire and other bodybuilding organizations in the relevant market. Thus, the IFBB Family's anticompetitive activities harm Nspire's ability to regulate, promote, and sanction major amateur and professional bodybuilding competitions, and to derive income from associated activities. Furthermore, the IFBB Family's conduct is causing a potential imminent exclusion of Nspire from the relevant market.

## CAUSES OF ACTION

### Count I
### Unlawful Restraint of Trade
### (Violation of Section 1 of the Sherman Act)
### NPC, IFBB International, IFBB Professional

82.     Plaintiff restates and re-alleges the preceding paragraphs of the First Amended Complaint.

83.     NPC, IFBB International, and IFBB Professional have entered unlawful arrangements that (i) unreasonably restrain elite amateur bodybuilders from earning money in

connection with non-NPC-sanctioned bodybuilding events while retaining their amateur status within the IFBB Family; and (ii) unreasonably prevent competition for the services of such elite amateur bodybuilders in their trade.

84. Specifically, NPC, IFBB International, and IFBB Professional have entered into a series of anticompetitive agreements with each other wherein (i) IFBB Professional maintains a policy that requires U.S.-based amateurs to win or place highly at certain NPC-sponsored amateur competitions in order to join IFBB Professional; (ii) IFBB International has promulgated rules that automatically subject NPC's athletes without their knowledge to the loyalty rules contained in IFBB International's Constitution; (iii) NPC maintains a policy that excludes bodybuilders who compete for money in competitions held by bodybuilding organizations outside the IFBB Family from competing in NPC-sanctioned events; and (iv) NPC maintains a practice where it will point out the loyalty rules in IFBB International's Constitution to prevent amateur athletes from participating in contests run by competing bodybuilding organizations. In combination, the rules, policies, and practices force all U.S.-based amateur bodybuilders who want to become an IFBB Professional athlete to compete exclusively at NPC-sanctioned events and to forego all potential income from bodybuilding contests until they are elevated to the ranks of professional bodybuilders within the IFBB Family

85. In addition, NPC, IFBB International, and IFBB Professional have used that web of interlocking rules, policies, and practices to prevent other bodybuilding organizations from competing for the services of elite amateur bodybuilders who could compete either in major amateur competitions or in professional competitions sanctioned, regulated, and/or promoted by that rival bodybuilding organization.

86. The web of interlocking arrangements constitutes an unreasonable restraint of trade under the rule of reason. The rules, policies, and practices of the individual members of the IFBB Family substantially restrain and injure competition in the market and will continue to do so.

87. NPC has market power in the input market for U.S.-based elite amateur bodybuilding athletes reasonably capable of turning professional and the output market for the regulation, sanctioning, and promoting of major amateur bodybuilding events in the United States, while IFBB Professional has monopoly power over the output market for the regulation, sanctioning, and promoting of professional bodybuilding events worldwide. Prohibiting elite amateur bodybuilders from earning a living at their craft and preventing non-IFBB Family bodybuilding organization from competing for their services harms the quality of NPC-sanctioned events. It also reduces the market output as a whole by decreasing the number of professional bodybuilders.

88. The interlocking arrangements of NPC, IFBB Professional, and IFBB International are not necessary for the production of major amateur or professional bodybuilding competitions, or the achievement of any pro-competitive objective.

89. Competition is hurt by the interlocking arrangements that NPC, IFBB Professional, and IFBB International have orchestrated because (i) NPC shows are of lower quality than they would be if competition existed in the output market of major amateur bodybuilding events; (ii) prize money available at IFBB Professional competitions is lower than it would be if competition existed in the output market of professional bodybuilding events and/or competition in the input market for elite amateur bodybuilders (since IFBB Professional would have to offer higher prizes to attract elite amateur bodybuilding athletes); and

(iii) bodybuilders could earn a living from their sport in greater numbers and with greater speed if competition existed in the input market for elite amateur bodybuilders.

90.     Nspire has suffered and will continue to suffer antitrust injury to its business by reason of the continuation of the IFBB Family's unlawful combination or conspiracy because the interlocking arrangements of NPC, IFBB Professional, and IFBB International have harmed Nspire's ability to recruit athletes and put on competitions.

**Count II**
**Monopolization of Output Market for Major Amateur Competitions**
**(Violation of Section 2 of the Sherman Act)**
**NPC**

91.     Plaintiff restates and re-alleges the preceding paragraphs of the First Amended Complaint.

92.     As detailed above, the relevant market is the output market for the regulation, sanctioning, and promoting of major amateur bodybuilding competitions in the United States.

93.     NPC has acquired a monopoly over the market for major amateur bodybuilding competitions in the United States, in that it regulates, sanctions, and/or promotes over 50% (amounting to approximately 300 events annually) of all amateur bodybuilding events in the United States, including the overwhelming majority of events held in larger venues where attendance and sponsorship revenues are highest.  There is no other bodybuilding organization that holds more than a few dozen competitions in the United States, and those are typically non-major – *i.e.*, held at smaller venues such as high schools and middle schools.

94.     NPC has willfully acquired their monopoly over the relevant market by:

a.      Expelling or threatening to expel amateur athletes who compete

outside the NPC from that organization, while simultaneously

making NPC membership a necessary requirement to join the ranks of IFBB Professional athletes.

b.      Requiring athletes, judges, vendors, and sponsors to work exclusively with NPC, either through formal agreements or by threatening that Jim Manion's highly influential businesses will cut ties with those athletes, judges, vendors, and sponsors who associate or do business with competing bodybuilding organizations.

c.      Engaging in predatory conduct – such as the use of intimidation, threats, punishment, harassment, and/or coercion – specifically aimed at athletes, judges, vendors, and sponsors who chose to associate with Nspire to cause those persons to disassociate from Nspire.

d.      Having agents, employees, and/or allies of NPC insinuate that Nspire is mismanaged and will soon be out of business.

95.      Competition is hurt by NPC's monopoly over the output market for the regulation, sanctioning, and promoting of major amateur bodybuilding competitions in the United States because NPC shows are of lower quality than they would be if competition existed in the output market of major amateur bodybuilding events.

96.      As a direct and proximate result of wrongdoing by NPC, as alleged herein, Nspire has been injured in its business, including those involving money damages, and likely will be driven from the relevant market altogether if NPC is not enjoined from engaging in its anticompetitive conduct.

**Count III**
**Monopsonization of Input Market for Elite Amateur Athletes**
**(Violation of Section 2 of the Sherman Act)**
**NPC**

97.     Plaintiff restates and re-alleges the preceding paragraphs of the First Amended Complaint.

98.     As detailed above, the relevant market is the input market for U.S.-based elite amateur bodybuilders.

99.     NPC has acquired a monopsony on the market for elite U.S.-based amateur bodybuilders, in that well over 80% of the U.S.-based bodybuilding athletes with a reasonable expectation of making a living in bodybuilding are NPC members.

100.    NPC has willfully acquired their monopsony over the relevant market by:

    a.      Expelling or threatening to expel elite amateur athletes who compete outside the NPC from that organization, while simultaneously making NPC membership a necessary requirement to join the ranks of IFBB Professional athletes.

    b.      Requiring elite amateur athletes to work exclusively with NPC, either through formal agreements or by threatening that Jim Manion's highly influential businesses will cut ties with those athletes who associate or do business with competing bodybuilding organizations.

    c.      Engaging in predatory conduct – such as the use of intimidation, threats, punishment, harassment, and/or coercion – specifically aimed at athletes who chose to associate with Nspire to cause those individuals to disassociate from Nspire.

48

      d.     Having agents, employees, and/or allies of NPC insinuate that

            Nspire is mismanaged and will soon be out of business.

101.    Competition is hurt by NPC's monopsony over the input market for U.S.-based elite amateur bodybuilders because (i) prize money available at IFBB Professional competitions is lower than it would be if competition existed in the output market of professional bodybuilding events and/or competition in the input market for elite amateur bodybuilders (since IFBB Professional would have to offer higher prizes to attract elite amateur bodybuilding athletes); and (ii) bodybuilders could earn a living from their sport in greater numbers and with greater speed if competition existed in the input market for elite amateur bodybuilders.

102.    As a direct and proximate result of wrongdoing by NPC, as alleged herein, Nspire has been injured in its business, including those involving money damages, and likely will be driven from the relevant market altogether if NPC is not enjoined from engaging in its anticompetitive conduct.

## Count IV
### Attempted Monopolization of Output Market for Major Amateur Competitions
### (Violation of Section 2 of the Sherman Act)
### NPC

103.    Plaintiff restates and re-alleges the preceding paragraphs of the First Amended Complaint.

104.    As detailed above, the relevant market is the output market for the regulation, sanctioning, and promoting of major amateur bodybuilding competitions in the United States.

105.    NPC has attempted to acquire a monopoly over the market for major amateur bodybuilding competitions in the United States, in that it regulates, sanctions, and/or promotes over 50% (amounting to approximately 300 events annually) of all amateur bodybuilding events in the United States, including the vast majority of events held in larger venues where attendance

and sponsorship revenues are highest.  There is no other bodybuilding organization that holds more than a few dozen competitions in the United States, and those are typically non-major – *i.e.*, held at smaller venues such as high schools and middle schools.  Thus, NPC possesses and exercises significant power in the market for major amateur bodybuilding contests in the United States, and there is a dangerous probability that NPC will succeed in obtaining a monopoly in that market.  If that happens, the injuries and anticompetitive affects described herein will only continue and become more egregious.

106.   NPC has willfully attempted to acquire a monopoly over the relevant market by:

    a.   Expelling or threatening to expel amateur athletes who compete outside the NPC from that organization, while simultaneously making NPC membership a necessary requirement to join the ranks of IFBB Professional athletes.

    b.   Requiring athletes, judges, vendors, and sponsors to work exclusively with NPC, either through formal agreements or by threatening that Jim Manion's highly influential businesses will cut ties with those athletes, judges, vendors, and sponsors who associate or do business with competing bodybuilding organizations.

    c.   Engaging in predatory conduct – such as the use of intimidation, threats, punishment, harassment, and/or coercion – specifically aimed at athletes, judges, vendors, and sponsors who chose to associate with Nspire to cause those persons to disassociate from Nspire.

     d.    Having agents, employees, and/or allies of NPC insinuate that

          Nspire is mismanaged and will soon be out of business.

107.    Competition is hurt by NPC's attempt to achieve a monopoly over the output market for the regulation, sanctioning, and promoting of major amateur bodybuilding competitions in the United States because NPC shows are of lower quality than they would be if competition existed in the output market of major amateur bodybuilding events.

108.    As a direct and proximate result of wrongdoing by NPC, as alleged herein, Nspire has been injured in its business, including those involving money damages, and likely will be driven from the relevant market altogether if NPC is not enjoined from engaging in its anticompetitive conduct.

**Count V**
**Attempted Monopsonization of Output Market for Elite Amateur Athletes**
**(Violation of Section 2 of the Sherman Act)**
**NPC**

109.    Plaintiff restates and re-alleges the preceding paragraphs of the First Amended Complaint.

110.    As detailed above, the relevant market is the input market for U.S.-based elite amateur bodybuilders.

111.    NPC has attempted to acquire a monopsony on the market for elite U.S.-based amateur bodybuilders, in that well over 80% of the U.S.-based bodybuilding athletes with a reasonable expectation of making a living in bodybuilding are NPC members.  There is no other amateur bodybuilding organization that can boast of a similar roster of elite bodybuilding athletes.  Thus, NPC possesses and exercises significant power in the market for U.S.-based elite amateur bodybuilding athletes, and there is a dangerous probability that NPC will succeed in

obtaining a monopsony in that market.  If that happens, the injuries and anticompetitive affects described herein will only continue and become more egregious.

112.    NPC has willfully attempted to acquire its monopsony over the relevant market by:

a.    Expelling or threatening to expel elite amateur athletes who compete outside the NPC from that organization, while simultaneously making NPC membership a necessary requirement to join the ranks of IFBB Professional athletes.

b.    Requiring elite amateur athletes to work exclusively with NPC, either through formal agreements or by threatening that Jim Manion's highly influential businesses will cut ties with those athletes who associate or do business with competing bodybuilding organizations.

c.    Engaging in predatory conduct – such as the use of intimidation, threats, punishment, harassment, and/or coercion – specifically aimed at athletes who chose to associate with Nspire to cause those individuals to disassociate from Nspire.

d.    Having agents, employees, and/or allies of NPC insinuate that Nspire is mismanaged and will soon be out of business.

113.    Competition is hurt by NPC's attempt to achieve a monopsony over the input market for U.S.-based elite amateur bodybuilders because (i) prize money available at IFBB Professional competitions is lower than it would be if competition existed in the output market of professional bodybuilding events and/or competition in the input market for elite amateur

bodybuilders (since IFBB Professional would have to offer higher prizes to attract elite amateur bodybuilding athletes); and (ii) bodybuilders could earn a living from their sport in greater numbers and with greater speed if competition existed in the input market for elite amateur bodybuilders.

114.    As a direct and proximate result of wrongdoing by NPC, as alleged herein, Nspire has been injured in its business, including those involving money damages, and likely will be driven from the relevant market altogether if NPC is not enjoined from engaging in its anticompetitive conduct.

**Count VI**
**Conspiracy to Monopolize Output Market for Major Amateur Competitions**
**(Violation of Section 2 of the Sherman Act)**
**NPC, IFBB International, IFBB Professional**

115.    Plaintiff restates and re-alleges the preceding paragraphs of the First Amended Complaint.

116.    As detailed above, the relevant market is the output market for the regulation, promotion, sanctioning, and staging of major amateur bodybuilding competitions in the United States.

117.    NPC, IFBB International, and IFBB Professional have entered a conspiracy to achieve a monopoly in the relevant market by entering a series of anticompetitive agreements with each other wherein (i) IFBB Professional maintains a policy that requires U.S.-based amateurs to win or place highly at certain NPC-sponsored amateur competitions in order to join IFBB Professional; (ii) IFBB International has promulgated rules that automatically subject NPC's athletes without their knowledge to the loyalty rules contained in IFBB International's Constitution; (iii) NPC maintains a policy that excludes bodybuilders who compete for money in competitions held by bodybuilding organizations outside the IFBB Family from competing in

NPC-sanctioned events; and (iv) NPC maintains a practice where it will point out the loyalty rules in IFBB International's Constitution to prevent amateur athletes from participating in contests run by competing bodybuilding organizations.   The conspiracy among the three defendants results in a web of agreements between them that forces all U.S.-based amateur bodybuilders who want to become an IFBB Professional athlete to compete exclusively at NPC-sanctioned events and to forego all potential income from bodybuilding contests until they are elevated to the ranks of professional bodybuilders within the IFBB Family.

118.    Furthermore, NPC, IFBB Professional, and IFBB International have contracted, combined, and/or conspired amongst themselves and with certain publishing, manufacturing, distribution, and marketing business owned, operated, or controlled by Jim Manion to destroy competition within the relevant market by:

a.    Expelling or threatening to expel amateur athletes who compete outside the NPC from that organization, while simultaneously making NPC membership a necessary requirement for advancement to the ranks of professional bodybuilding within the IFBB Family.

b.    Requiring bodybuilding athletes, judges, vendors, and sponsors to work exclusively with NPC, IFBB Professional, and/or IFBB International, either through formal agreements or by threatening that Jim Manion's highly influential businesses will cut ties with those athletes, judges, vendors, and sponsors who associate or do business with competing bodybuilding organizations.

c.      Engaging in predatory conduct – such as the use of intimidation, threats, punishment, harassment, and/or coercion – specifically aimed at athletes, judges, vendors, and sponsors who chose to associate with Nspire to cause those persons to disassociate from Nspire.

d.      Having the IFBB Family's agents, employees, and/or allies insinuate that Nspire is mismanaged and will soon be out of business.

119.     Competition is hurt by NPC, IFBB International, and IFBB Professional's conspiracy to achieve a monopoly over the output market for the regulation, sanctioning, and promoting of major amateur bodybuilding competitions in the United States because NPC shows are of lower quality than they would be if competition existed in the output market of major amateur bodybuilding events.

120.     As a direct and proximate result of the NPC, IFBB Professional, and IFBB International's collective wrongdoing, as alleged herein, Nspire has been injured in its business, including those involving money damages, and likely will be driven from the relevant market altogether if NPC, IFBB Professional, and IFBB International are not enjoined from engaging in their anticompetitive conduct.

**Count VII**
**Conspiracy to Monopsonize Input Market for Elite Amateur Athletes**
**(Violation of Section 2 of the Sherman Act)**
**NPC, IFBB International, IFBB Professional**

121.     Plaintiff restates and re-alleges the preceding paragraphs of the First Amended Complaint.

122.    As detailed above, the relevant market is the input market for U.S.-based elite amateur bodybuilders.

123.    NPC, IFBB International, and IFBB Professional have entered a conspiracy to achieve a monopsony in the relevant market by entering a series of anticompetitive agreements with each other wherein (i) IFBB Professional maintains a policy that requires U.S.-based amateurs to win or place highly at certain NPC-sponsored amateur competitions in order to join IFBB Professional; (ii) IFBB International has promulgated rules that automatically subject NPC's athletes without their knowledge to the loyalty rules contained in IFBB International's Constitution; (iii) NPC maintains a policy that excludes bodybuilders who compete for money in competitions held by bodybuilding organizations outside the IFBB Family from competing in NPC-sanctioned events; and (iv) NPC maintains a practice where it will point out the loyalty rules in IFBB International's Constitution to prevent amateur athletes from participating in contests run by competing bodybuilding organizations.  The conspiracy among the three defendants results in a web of agreements between them that forces all U.S.-based amateur bodybuilders who want to become an IFBB Professional athlete to compete exclusively at NPC-sanctioned events and to forego all potential income from bodybuilding contests until they are elevated to the ranks of professional bodybuilders within the IFBB Family.

124.    Furthermore, NPC, IFBB Professional, and IFBB International have contracted, combined, and/or conspired amongst themselves and with certain publishing, manufacturing, distribution, and marketing business owned, operated, or controlled by Jim Manion to destroy competition within the relevant market by:

       a.     Expelling or threatening to expel amateur athletes who compete outside the NPC from that organization, while simultaneously

making NPC membership a necessary requirement for advancement to the ranks of professional bodybuilding within the IFBB Family.

b.    Requiring elite amateur bodybuilding athletes to work exclusively with NPC, either through formal agreements or by threatening that Jim Manion's highly influential businesses will cut ties with those athletes, judges, vendors, and sponsors who associate or do business with competing bodybuilding organizations.

c.    Engaging in predatory conduct – such as the use of intimidation, threats, punishment, harassment, and/or coercion – specifically aimed at elite amateur athletes who chose to associate with Nspire to cause those persons to disassociate from Nspire.

d.    Having the IFBB Family's agents, employees, and/or allies insinuate that Nspire is mismanaged and will soon be out of business.

125.    Competition is hurt by NPC, IFBB International, and IFBB Professional's conspiracy to achieve a monopsony over the input market for U.S.-based elite amateur bodybuilders because (i) prize money available at IFBB Professional competitions is lower than it would be if competition existed in the output market of professional bodybuilding events and/or competition in the input market for elite amateur bodybuilders (since IFBB Professional would have to offer higher prizes to attract elite amateur bodybuilding athletes); and (ii) bodybuilders could earn a living from their sport in greater numbers and with greater speed if competition existed in the input market for elite amateur bodybuilders.

126.    As a direct and proximate result of the NPC, IFBB Professional, and IFBB International's collective wrongdoing, as alleged herein, Nspire has been injured in its business, including those involving money damages, and likely will be driven from the relevant market altogether if NPC, IFBB Professional, and IFBB International are not enjoined from engaging in their anticompetitive conduct.

**JURY DEMAND**

127.    Plaintiff hereby demands a trial by jury on all issues so triable.

**PRAYER**

WHEREFORE, Plaintiff prays:

a.   That the IFBB Family be enjoined from further anticompetitive conduct, as described herein;

b.   That Plaintiff be awarded treble their actual damages in an amount to be determined at trial;

c.   That Plaintiff be awarded prejudgment and post-judgment interest as well as costs and reasonable attorneys' fees under applicable law; and

d.   That Plaintiff be awarded such and other further relief as this Court deems just and proper under the circumstances.

Respectfully submitted,

Dated:  April 26, 2016

/s/ Craig C. Reilly
Craig C. Reilly VSB # 20942
craig.reilly@ccreillylaw.com
The Law Office of Craig C. Reilly
111 Oronoco Street
Alexandria, VA 22314
Telephone:      703-549-5354
Facsimile:       703-549-5355

Scott A. Cunning, II VSB #. 68071
scott.cunning@haynesboone.com
Thomas J. Lang (*pro hac vice*)
thomas.lang@haynesboone.com
Michael J. Scanlon (*pro hac vice*)
michael.scanlon@haynesboone.com
Scott Benfield (*pro hac vice*)
scott.benfield@haynesboone.com
HAYNES AND BOONE, LLP
800 17th Street, NW, Suite 500
Washington, DC 20006
Telephone:      (202) 654-4500
Facsimile:       (202) 654-4245

Richard D. Anigian  (*pro hac vice*)
rick.anigian@haynesboone.com
Nick Nelson (*pro hac vice*)
nick.nelson@haynesboone.com
HAYNES AND BOONE, LLP
One Victory Park
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
Telephone:      (214) 651-5000
Facsimile:       (214) 651-5940

*Attorneys for Plaintiff Nspire Sports League, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of April, 2016, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel registered to receive such notice.

Respectfully submitted,

Dated:  April 26, 2016

/s/ Craig C. Reilly
Craig C. Reilly VSB # 20942
craig.reilly@ccreillylaw.com
The Law Office of Craig C. Reilly
111 Oronoco Street
Alexandria, VA 22314
Telephone:      703-549-5354
Facsimile:      703-549-5355

*Attorney for Plaintiff Nspire Sports League, LLC*